**Maurice SPARKS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–17630.**

Court of Criminal Appeals of Oklahoma.

Nov. 22, 1972.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., Yvonne Sparger, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, Maurice Sparks, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Oklahoma County, for the offense of Robbery With Firearms. His punishment was fixed at twenty (20) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Leo Scruggs, Jr., testified that he was seventeen years old and that, on October 24, 1971, he was with a friend, Ronnie Summers, who let him out of the car at 50th and North Eastern to get a pack of cigarettes. As he left the store, he encountered the defendant, who "put it [a gun] up to me and forced me into his car." (Tr. 12) The defendant's girl friend, Co-defendant Mackie Mae McFee, was driving the car. They entered the expressway and the defendant, still brandishing the gun, asked him if he had any money. Scruggs advised the defendant that he did not have any money. The defendant then took his ring and watch. They pulled off the expressway "towards a lake or river or something" where defendant ordered Scruggs out of the car, then struck him with a jack handle and forced him back into the car. They drove to a beer joint on 23rd and Bryant where the defendant left the gun with Co-defendant McFee and entered the tavern. Scruggs grappled with Co-defendant McFee over the gun and managed to escape from the car and run to a filling station across the street where help was called. He identified State's Exhibits 1 and 2 as his watch and ring that were

taken by the defendant. On October 24, he received a telephone call from a person identifying himself as "Maurice." The caller stated that if Scruggs would drop the charges, he (the caller) could be reached at a certain telephone number. He subsequently gave the telephone number to the police.

Officer Summers testified that he was assigned to make a follow-up investigation of the robbery. He was furnished a telephone number and traced it to Co-defendant McFee's residence at 1428 S.E. 20. He proceeded to the address on November 5, knocked on the door and an inside light went out and a door slammed. Shortly thereafter, Co-defendant McFee drove up and admitted him to the house. He found the defendant in bed in the north bedroom, placed him under arrest, and advised him of his constitutional rights. He questioned the defendant concerning the robbery and defendant "denied pulling the robbery." Co-defendant McFee then interrupted, stating that she was present at the time of the alleged robbery. She was placed under arrest and advised of her Miranda rights. As they were being taken to the police unit, the defendant stated that he would show them where the watch and ring were. They went back into the house and the defendant pointed to a wooden plate in the wall which covered the plumbing. Summers removed the plate and observed the watch and ring under the house.

On cross-examination, he testified that Scruggs had informed him that there were two women and a man involved in the robbery. Scruggs further stated to him that when they arrived at the bar at 23rd and Bryant, he managed to get the gun away from the girl and, after getting out of the car, threw the gun at the defendant.

For the defense, Marvin Harrison testified that he was with the defendant and Co-defendant McFee the afternoon of October 24. At about 2:00, a red Mustang drove up with Leo Scruggs sitting in the back seat. Defendant got out of their car and talked to the persons in the red Mustang. The defendant returned and told them that he was going with the people in the Mustang and for them to go to the Pussy Cat Club where he would call them. They proceeded to the Pussy Cat Club and waited several hours for the defendant to call. The defendant called them at the Pussy Cat Club around 6 or 7:00 and asked to be picked up at 53rd and Springlake Drive. They proceeded to the address and observed the defendant in the front yard talking to Leo Scruggs and several other people.

Co-defendant McFee testified she was 27 years old and had known the defendant approximately six months. On the afternoon of October 24, she was with the defendant and Marvin Harrison at 19th and Prospect. A red Mustang approached and defendant got out to talk to the occupants. He returned, told them that he would call them later at the Pussy Cat Club and left with the people in the Mustang. She and Harrison went to the Club and waited until the defendant called them about 6.00 p.m. requesting that they pick him up on 57th Street. The defendant, Leo Scruggs and several others were out in the yard. She, Scruggs and the defendant went into the house for a short time. They left the house together with Scruggs riding in the back seat. Scruggs and the defendant had a conversation concerning money that Scruggs owed the defendant. Scruggs suggested to the defendant that he take his watch and ring as security until he repaid him the money. When they arrived at the Bryant Club, Scruggs and the defendant starting fighting in the car. She told them to get out of the car. Scruggs grabbed her purse where the defendant had put the watch and ring. Everything fell out of the purse and Scruggs grabbed her gun. Scruggs fired the gun several times at the defendant, one shot striking him in the leg. She started driving away and stopped to pick up the defendant.

The defendant testified that he was 31 years old and had known Co-defendant McFee for about six months, and Scruggs about four months. On the afternoon of October 24, he was talking with some friends on 19th Street when a car contain-

ing Leo Scruggs drove up. He went over to the car and talked to Scruggs about the Fifty Dollars ($50.00) that Scruggs owed him. He got in the car with Scruggs with the hopes of being able to collect part of the debt. They went to Scruggs' girlfriend's house where Scruggs stated he might be able to get some of the money. When he ascertained that Scruggs was not going to get any money, he called Co-defendant McFee at the Pussy Cat Club. When Co-defendant McFee arrived, Scruggs stated that he would try to get some of the money if they would take him to another club. On the way to the club, he and Scruggs had a heated conversation cencerning the repayment of the debt. Scruggs insisted that he take his watch and ring as security for the debt. When they arrived at the club, they started fighting. Co-defendant McFee told them to get out of the car. He (the defendant) got out of the car and started into the club. He turned around and observed that Scruggs had a gun. Scruggs fired five or six shots at him, one of which struck him in the leg.

In rebuttal, Leo Scruggs was recalled and denied ever having borrowed money from the defendant. He also denied shooting at the defendant.

Leona Scruggs, Leo's mother, testified that on October 24 Leo was home until approximately 6:00 p. m.

Barbara Littlejohn, Leo's girlfriend, testified that she lived at 1705 North Fairmont. On October 24, Leo called her about 3:00 and said that he would be over later. Around 11:00 p. m., he called her from a filling station and asked her to pick him up. Leo had been struck in the head and she took him to the University Hospital.

In surrebuttal, Officer Smith testified that he assisted in booking the defendant into jail after he was arrested. Defendant stated that he had been shot in the leg. He observed a puncture wound in defendant's left thigh and an exit wound in the back of the leg.

The first proposition asserts that improper evidence was introduced and prejudicial argument made thereon. The record reflects that the following transpired during cross-examination of the defendant:

"Q. Have you ever been convicted of a crime?

"A. No, sir.

"Q. I want you to think about that again. Have you ever been convicted of a crime?

"A. I have been committed.

"Q. Have you ever been convicted of a felony?

"A. I was committed.

"Q. Have you ever been convicted of possession of heroin?

"A. I was committed to a drug abuse—

"Q. And sentenced to seven years in the State Penitentiary?

"MRS. CORRIGAN: If the Court please, the answer of the witness was no. We object to any further harassments.

"MR. MILLER: I will be happy to prove it, Your Honor.

"THE COURT: I expect you ought to if you want to prove it.

"BY MR. MILLER: (Continuing) Q. You want this Jury to believe that you have not been convicted of the crime of possession of heroin in—

"MRS. CORRIGAN: Now, if the Court please, we are going to object to that. That is improper questioning after he says no.

"MR. MILLER: If she will just sit down, I will prove it.

"MRS. CORRIGAN: It is blatant prejudicial error.

"THE COURT: Overruled, go ahead.

"BY MR. MILLER: (Continuing) Q. You want this Jury to believe that you were not convicted of possession of heroin on the 20th of September, 1970, in Superior Court of the State of California, Los Angeles? That wasn't you?

"A. I was committed to a drug abuse program, rehabilitation.

"Q. I agree with that. They found that you were a heroin addict and they sent you to a hospital, but you are also convicted of a felony, possession of heroin, is that right?

"MRS. CORRIGAN: Now, we object to counsel's testifying, Your Honor.

"MR. MILLER: Cross examination.

"MRS. CORRIGAN: We send them to Norman all of the time and they are never convicted.

"MR. MILLER: I will asked [sic] to have marked as State's Exhibit No. 4—

"MRS. CORRIGAN: We object to this, Your Honor, as heresay evidence.

"MR. MILLER: —certified copies of the Judgment and Sentence from the State of California showing this man was convicted of possession of heroin and sentenced to seven years in the pentiteniary [sic]." (Tr. 142–144)

State's Exhibit No. 4, which was introduced over the objection of the defendant, reflects that on December 28, 1967, the defendant entered a plea of guilty in the Superior Court of the State of California for the County of Los Angeles, to some undisclosed charge. The probation and sentence hearing was continued to January 26, 1968. On January 26, 1968, the State filed a Petition for Commitment of defendant to the Director of Corrections for confinement in the Narcotic Detention, Treatment and Rehabilitation Facility under provisions of § 3050 of the California Welfare and Institutions Code. The petition states that the "criminal proceedings are now adjourned." February 13, 1968, the hearing was had on the State's petition and the defendant was found to be "in imminent danger of becoming a narcotic drug addict" and was committed to the Director of Corrections at the California Rehabilitation Center. The exhibit next contains a letter from the Department of Corrections to the Presiding Judge of the Los Angeles County Superior Court stating that the defendant was released to outpatient status on November 13, 1968; further, that the defendant is not suitable for treatment as a civilly committed person and has been beyond their control for a period exceeding one year. The final page of the exhibit reflects that "the NDA petition having been dismissed, a bench warrant is ordered and issued; no bail."

We first observe that the exhibit was not admissible in that it was not authenticated according to the provisions of 12 O.S., § 485, which provides:

"Copies of records and proceedings in the courts of a foreign country may be admitted in evidence, upon being authenticated as follows:

"First. By the official attestation of the clerk or officer in whose custody such records are legally kept, and,

"Second. By the certificate of one of the judges or magistrate of such court, that the person so attesting is the clerk or officer legally intrusted with the custody of such records, and that the signature to his attestation is genuine; and,

"Third. By the official certificate of the officer who has the custody of the principal seal of the government under whose authority the court is held, attested by said seal, stating that such court is duly constituted, specifying the general nature of its jurisdiction, and verifying the seal of the court."

The exhibit reflects that it is only authenticated by the Deputy Court Clerk.

■ We next observe that the first page of the exhibit reflects that the defendant withdrew a plea of Not Gilty and entered a plea of Guilty without stating to what offense. The defendant was thereafter civilly committed to the rehabilitation facility of the Department of Corrections and the criminal proceedings were adjourned. The criminal proceedings were thereafter reinstated when defendant failed to comply with the outpatient treatment at the facility; however, judgment and sentence has never been pronounced. Under

such circumstances, we cannot hold that the same constitutes a final valid conviction.

■ Having decided that the exhibit was improperly admitted, we must thus reach the ultimate question as to whether the same constitutes reversible error. Although the court instructed the jury that they could consider the same only as to affect the weight and credit of defendant's testimony, the prosecuting attorney, in his closing argument, argued that the defendant was a known heroin addict and committed the robbery to support his habit. The record reflects the following:

"MR. MILLER: Maurice Sparks tells you that he has never been convicted of a crime and Mrs. Corrigan didn't really want me to go into that. I want you to look at this. It has been introduced into evidence as State's Exhibit No. 4. You take that into the Jury Room and you can look at it.

"You know what it is going to tell you? It is going to tell you that he is a heroin addict. It is going to tell you that he was convicted in the State of California of possession of heroin." (Tr. 213)

The prosecuting attorney further stated:

"No, if you think that that—think that anybody is going to give that guy a $300.00 diamond ring and wrist watch as security on a loan for $50.00, do you believe that? Okay. Let's look at Maurice again. What does he need that watch and ring for? Maurice is a heroin addict.

"Do you have any idea what heroin costs? I suspect you do because you read just a little bit just like I do and you know what heroin is.

* * * * * *

"MR. MILLER: All right. You know enough about heroin to know if you can become other than that, don't you? I mean once you are addicted, you know whether you can get off heroin on not.

"I presume you know as much about it as I do probably. You know as much about the cost as I do.

* * * * * *

"MR. MILLER: And you know what a person who is addicted to heroin, who isn't employed or only employed part time is going to have to do to get the money to buy his heroin, don't you? Things like this. Stick up somebody and get a diamond ring and an expensive watch that I can sell to get some more heroin." (Tr. 218–220)

We are of the opinion that the introduction of the improper exhibit and the argument pertaining to the exhibit was so prejudicial to the defendant as to require reversal.

The judgment and sentence is reversed and remanded.

BRETT, J., concurs.